1
2
3
4
5
6
7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT COURT OF CALIFORNIA

10

11   KATHLEEN CARROLL,

12              Plaintiff,              No. 2:13-cv-00249-KJM-KJN

13        vs.

14   STATE OF CALIFORNIA acting by          ORDER
     and through the California Commission
15   on Teacher Credentialing; DALE
     JANSSEN, in his individual capacity;
16   MARY ARMSTRONG, in her
     individual capacity; LEE POPE, in
17   his individual capacity; CHRISTA
     HILL in her individual capacity; ANI
18   KINDALL, in her individual capacity;
     et al.,
19
20              Defendants.

21
22   _____/

23              Before the court is defendants' motion to dismiss, (ECF 6), on which the court

24   held a hearing on April 9, 2013.  Dean Royer appeared for plaintiff; Susan Slager and Vanessa

25   W. Mott appeared for defendants California Commission on Teacher Credentialing ("CTC"),

26   Dale Janssen, Mary Armstrong, Lee Pope, Christa Hill, and Ani Kindall (collectively,

27   "defendants").  Plaintiff alleges she was terminated from her position as a staff attorney with

28

                                    1

the CTC in violation of the First Amendment and California whistleblower statutes.  For the reasons below, the court GRANTS in part and DENIES in part defendants' motion.

I.        ALLEGED FACTS AND PROCEDURAL BACKGROUND

Plaintiff is a licensed California attorney who worked as a staff counsel for defendant CTC.  (Compl. ¶ 12, Ex. A, ECF 1.)  The CTC "is a regulatory agency that serves as a state standards board for educator preparation for the public schools of California, the licensing and credentialing of professional educators, the enforcement of professional practices of educators, and the discipline of credential holders and applicants for credentials in the State of California."  (*Id.* ¶ 1.)  A Committee on Credentials ("Committee"), comprised of seven citizens and appointed by the nineteen-member CTC Commission ("Commission"), reviews disciplinary allegations against credential holders and applicants and recommends to the full Commission "a particular adverse action" when warranted.  (*Id.*)

Plaintiff alleges five different instances in which she complained about improper and illegal activities by the CTC and its employees, both internally to CTC supervisors and externally to the Bureau of State Auditing ("BSA") and State Senator Steinberg's office, because of which plaintiff was fired.  In the first incident, on about January 21, 2010, plaintiff reported to the Commission Chair that defendant CTC General Counsel Mary Armstrong falsely told the full Commission that there were no significant backlogs of unprocessed reports, cases, and documentary evidence concerning California credential applicants and credential holders ("educators").  (*Id.* ¶¶ 14–16.)

Second, on about January 26, 2010, plaintiff reported to defendant and CTC Director Dale Janssen that educator misconduct allegation reports and cases were not being timely processed, delaying mandatory actions against educators and potentially harming children, as some of the allegations involved sexual misconduct.  (*Id.* ¶ 17.)  On this occasion, plaintiff further reported to Janssen that the CTC discipline process lacked quality control, that low level employees were making case prioritization decisions, and that cronyism, nepotism, and favoritism were negatively impacting the CTC's work.  (*Id.*)

/////

2

Third, at about this same time, Janssen ordered an outside, private attorney to conduct an internal investigation into plaintiff's reports (the "internal investigation"). (*Id.* ¶ 18.) Plaintiff discussed some of her concerns with this investigator. (*Id.*) This investigation, which lasted until May 2010, was intended to discredit her and to justify taking adverse actions against her. (*Id.*) The investigator concluded Armstrong did not lie to the Commission about the lack of a significant backlog of cases at CTC. (*Id.*) Plaintiff alleges defendants Armstrong, CTC Assistant General Counsel Lee Pope, and CTC Senior Staff Counsel Ani Kindall became aware of plaintiff's reports about CTC misconduct prior to or during the course of this internal investigation. (*Id.* ¶ 19.)

In the fourth instance, in May 2010, the California Joint Legislative Audit Committee, at Senator Steinberg's request, authorized the BSA to conduct a formal audit of CTC's procedures and work environment (the "external investigation"). (*Id.* ¶ 20.) This audit resulted from plaintiff's "December 2009 contact with the BSA Whistleblower Hotline and subsequent report to Senator Steinberg in February of 2010." (*Id.*) During the BSA audit, conducted between June and September 2010, plaintiff reported to BSA auditors at least twelve different improper actions taken by CTC and its employees, including opening cases against teachers without legal authority and altering documents. (*Id.* ¶ 23.) Plaintiff alleges each of the named individual defendants was aware of her cooperation with the BSA audit. (*Id.* ¶ 24.) Finally, on a number of occasions between June and September 2010, plaintiff resisted or refused to take actions she believed violated the law or her duties as an attorney, including: refusing to tell the Committee she could not complete her research about guidelines for determining when a teacher's behavior overstepped boundaries with a student because she felt it was possible to complete the research with more time; and refusing to sign a letter requesting more information from a credential applicant because she believed the request would violate various laws. (*Id.* ¶ 22.)

As a result of these whistleblowing actions, plaintiff alleges she suffered four adverse employment actions. First, in June 2010, defendants Armstrong, Pope, and Director of Administrative Services Christa Hill decided plaintiff would be the sole CTC employee they

would lay off as part of a 2010-2011 fiscal year cost cutting measure.  (*Id.* ¶ 21.)  These defendants decided not to lay plaintiff off at that time because they allegedly realized they could not accomplish the layoff before the BSA auditors arrived.  (*Id.* ¶ 25.)  Second, before the BSA could complete its audit in September 2010, plaintiff alleges she was denied union representation for a meeting with Pope and Hill and was abruptly put on administrative leave in that meeting.  (*Id.*)  Third, at about this same time, plaintiff alleges she was denied a scheduled merit salary adjustment and then was summarily terminated on specious charges, effective November 29, 2010.  (*Id.*)  Fourth, defendants attempted to prevent plaintiff from obtaining unemployment benefits.  (*Id.*)  Plaintiff alleges defendants Janssen, Armstrong, Pope, and Hill participated in her termination, and that defendant Kindall exerted substantial influence on defendants Janssen, Armstrong, and Pope to achieve these adverse actions.  (*Id.*)

Plaintiff brought three administrative actions in the wake of her termination.  On about November 29, 2010, plaintiff timely appealed her termination to the State Personnel Board ("SPB").  (*Id.* ¶ 28.)  On about March 28, 2011, plaintiff filed a Whistleblower Retaliation Complaint with the SPB under Government Code sections 8547 *et seq.* and 19683 and under California Code of Regulations section 67.1 *et seq.*  (*Id.*)[1]  These two cases were consolidated and heard before a SPB Administrative Law Judge ("ALJ").  (*Id.*)  The ALJ issued a proposed decision denying plaintiff's appeal on April 16, 2012, and the SBP adopted the proposed decision on May 7, 2012.  (*Id.*)  Plaintiff then brought a third administrative action on July 3, 2012, presenting a completed Government Claims Form to the California Victim Compensation and Government Claims Board.  (*Id.* ¶ 29.)  This claim too was denied on July 12, 2012.  (*Id.*)

In April 2011, the BSA's external investigation confirmed plaintiff's reports of "serious mismanagement and significant document processing backlogs, a rampant level of nepotism and favoritism that existed throughout the CTC, unlawful delegation of decision making authority to CTC staff, and a high level of fear of retaliation among CTC employees."

---

[1] Plaintiff does not specify to which title of the California Code of Regulations she refers.

1   (*Id.* ¶ 26.)  Defendants Janssen, Armstrong, and Pope were removed or left their positions at the

2   CTC soon thereafter.  (*Id.* ¶ 27.)

3           Plaintiff filed her complaint on November 14, 2012 in Sacramento County

4   Superior Court pleading three causes of action: 1) violation of the California Whistleblower

5   Protection Act against defendant CTC; 2) violation of California Labor Code Section 1102.5

6   against defendant CTC; and 3) violation of her First Amendment Rights under 42 U.S.C.

7   § 1983 against the individual defendants.  Defendants removed the action to this court on

8   February 8, 2013 (ECF 1) and filed the instant motion to dismiss on February 15, 2013, arguing

9   among other things that plaintiff, as an attorney, is barred from bringing this action by her

10   ethical obligations to her former client the CTC (ECF 6).  Plaintiff filed her opposition on

11   March 29, 2013 (ECF 7), and defendants replied on April 5, 2013 (ECF 8).

12   II.     <u>STANDARD</u>

13           Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move

14   to dismiss a complaint for "failure to state a claim upon which relief can be granted."  A court

15   may dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts

16   alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699

17   (9th Cir. 1990).

18           Although a complaint need contain only "a short and plain statement of the

19   claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), in order to survive a

20   motion to dismiss this short and plain statement "must contain sufficient factual matter . . . to

21   'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

22   (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must

23   include something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation"

24   or "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of

25   action . . . .'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint will

26   survive a motion to dismiss for failure to state a claim is a "context-specific task that requires

27   the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

28   Ultimately, the inquiry focuses on the interplay between the factual allegations of the complaint

and the dispositive issues of law in the action.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

In making this context-specific evaluation, this court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  This rule does not apply to "'a legal conclusion couched as a factual allegation,'" *Papasan v. Allain*, 478 U.S. 265, 286 (1986), *quoted in Twombly*, 550 U.S. at 555, nor to "allegations that contradict matters properly subject to judicial notice," or to material attached to or incorporated by reference into the complaint.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A court's consideration of documents attached to a complaint or incorporated by reference or matter of judicial notice will not convert a motion to dismiss into a motion for summary judgment.  *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003).

III.    ANALYSIS

Because state law provides the rule of decision in this case, the court applies California privilege law even though the court has federal question jurisdiction over this case under 28 U.S.C. § 1441(a) and § 1331.  *See* FED. R. EVID. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.").

A.    California Whistleblower Protection Act (Cal. Gov't Code § 8547) ("CWPA")

Defendants argue that attorneys cannot be whistleblowers in California because of California's restrictive lawyer-client[2] confidentiality privilege.  (ECF 6-1 at 7–9.)[3]  Each

---

[2] California refers to what is more generally known as the attorney-client privilege as the lawyer-client privilege; because this order applies California law, the order uses California's terminology.

[3] Whether defendants seek to dismiss this suit on the basis of the lawyer-client privilege and/or the duty of confidentiality is unclear.  These two concepts are distinct.  While both apply to confidential information, the duty of confidentiality, as contained in the California Business and Professions Code, is broader than the lawyer-client privilege, which is a rule of evidence found in the California Evidence Code.  *Compare* Cal. Bus. & Prof. Code § 6068 ("It is the duty of an attorney to do all of the following: . . . (e) To maintain inviolate the confidence, and

1   whistleblower law excludes those disclosures that violate other laws or duties.  (*Id.* (citing

2   GOV'T CODE § 8547.3(d) (providing, "[n]othing in [the CWPA] shall be construed to authorize

3   an individual to disclose information otherwise prohibited by or under law")).)  Defendants cite

4   the California Attorney General's opinion on this issue, which concludes that the whistleblower

5   statutory protections applicable to employees of state and local public entities do not supersede

6   the statutes and rules governing the lawyer-client privilege.  84 Cal. Op. Att'y Gen. 71 (2001).

7   Defendants further argue that unsuccessful legislative attempts in California to protect attorney

8   whistleblowers imply that attorneys may not qualify for whistleblower status under current

9   California law.  (ECF 6-1 at 8–9.)

10          Plaintiff counters that many of her disclosures that qualify as protected under the

11  Whistleblower Act were made internally and therefore do not violate her duty of

12  confidentiality.  (ECF 7 at 8–9.)  Moreover, she argues her disclosures to the BSA were

13  authorized by California law, because the BSA is authorized to audit any state agency and to

14  examine the records or documents of the agency, including those protected by the lawyer-client

15  privilege.  (*Id.* (citing CAL. GOV'T CODE §§ 8543(b), 8564.1(b), 8545.2(a), 8545.4(a)(3),

16  8545.2).)  Finally, plaintiff asserts that her disclosures to the BSA hotline and Senator

17  Steinberg's office did not violate her confidentiality obligation because the CTC and the people

18  of the State of California are her clients.  (ECF 7 at 10–11.)

19          In reply, defendants cite *General Dynamics Corp. v. Superior Court*, 7 Cal. 4th

20  1164 (1994), and *Solin v. O'Melveny & Myers*, 89 Cal. App. 4th 451, 467 (2001), in support of

21  their argument that an attorney may not pursue a lawsuit if it cannot be decided without

22  breaching the lawyer-client  privilege.  (ECF 8 at 2.)  Because plaintiff here cannot pursue this

23  lawsuit without establishing facts that would violate the privilege, such as revealing the content

24

25

26  at every peril to himself or herself to preserve the secrets, of his or her client.") *with* Cal. Evid.

27  Code § 954 ("[T]he client, whether or not a party, has a privilege to refuse to disclose, and to
    prevent another from disclosing, a confidential communication between client and

28  lawyer . . . .").  In this opinion, the court uses these terms interchangeably.

7

of her discussions with the CTC, defendants argue she should be precluded from maintaining her Whistleblower Act and First Amendment retaliation claims.  (*Id.* at 3.)

The California Supreme Court in *General Dynamics* established that in-house attorneys may bring retaliatory discharge claims in two circumstances.  7 Cal. 4th at 1188. First, attorneys may sue when they allege they were terminated for refusing to violate a mandatory ethical duty embodied in the Rules of Professional Conduct: refusing to commit a crime, for example.  *Id.*  Hence, to survive a motion to dismiss, a plaintiff must plead that the conduct leading to her termination was required by a provision of California's Rules of Professional Conduct or a relevant statute.  *Id.* at 1188–89, 1192.

Second, attorneys may sue in the limited circumstances in which "in-house counsel's *nonattorney* colleagues would be permitted to pursue a retaliatory discharge claim *and* governing professional rules or statutes expressly remove the requirement of attorney confidentiality."  *Id.* at 1188 (original emphasis).  In this second circumstance, the plaintiff must plead facts to demonstrate two things: first, that "the employer's conduct is of the kind that would give rise to a retaliatory discharge action by a *nonattorney* employee under *Gantt v. Sentry Insurance*, 1 Cal. 4th 1083 (1992)";[4] and second, that "some statute or ethical rule specifically permits the attorney to depart from the usual requirement of confidentiality with respect to the client-employer and engage in the 'nonfiduciary' conduct for which he was terminated."  *Id.* at 1189 (original emphasis).

Acknowledging the confidentiality concerns of companies with in-house attorney employees, the California Supreme Court noted several additional limitations on retaliation claims.  For example, "where the elements of a wrongful discharge in violation of fundamental public policy claim cannot, for reasons peculiar to the particular case, be fully

---

[4] In *Green v. Ralee Engineering Co.*, 19 Cal. 4th 66, 76–77 (1998), the California Supreme Court noted that whistleblower protection statutes, such as Labor Code section 1102.5, satisfied this prong.  The court also broadened *Gantt*'s holding, in which the court permitted retaliatory suits (as a species of *Tameny* claim) based on public policies expressed in constitutional or statutory provisions, to include suits based on public policies expressed in regulations as well.  *Id.* at 71.

established without breaching the lawyer-client privilege, the suit must be dismissed in the interest of preserving the privilege." *Id.* However, the court "underline[d] the fact that such drastic action will seldom if ever be appropriate at the demurrer stage of litigation." *Id.* The court also instructed that "the trial courts can and should apply an array of ad hoc measures from their equitable arsenal designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege." *Id.* at 1191. Some of these measures are "sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings." *Id.* The court also noted that an attorney who unsuccessfully pursues a retaliation claim risks being subject to State Bar disciplinary proceedings. *Id.* at 1191.

Here, the court finds plaintiff's CWPA claim is not categorically barred by confidentiality concerns at this stage of the litigation. Defendants argue plaintiff cannot pursue this litigation at all without violating her duty of confidentiality; the court cannot determine at the pleading stage whether this is so. The Ninth Circuit considered a similar argument in *Van Asdale v. International Game Technology*, 577 F.3d 989 (9th Cir. 2009). In that case, the court followed the Third and Fifth Circuits and permitted in-house attorneys barred in Illinois to bring federal whistleblower claims, despite the Illinois Supreme Court's holding that in-house counsel cannot bring retaliatory discharge claims. *Id.* at 994–95. The court held the plaintiffs could pursue a whistleblower action under the Sarbanes-Oxley Act and vacated the district court's dismissal of appended state retaliation and tort claims, notwithstanding the defendant's protestations that pursuing the suit would require the plaintiffs to violate their duty of confidentiality. *Id.* The court finds persuasive the *Van Asdale* court's reasoning, that it was premature to dismiss at the pleading stage because it was not clear to what extent the lawsuit would actually require disclosure of the defendant's confidential information. *Id.* at 995; *see also Willy v. Admin. Review Bd.*, 423 F.3d 483 (5th Cir. 2005); *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 182 (3rd Cir. 1997).

Plaintiff has adequately pled that some of her protected conduct leading to her termination was required or supported by California's Rules of Professional Conduct. 7 Cal. 4th at 1192.  For example, plaintiff pleads she refused to take actions she believed violated her mandatory duties as an attorney, such as those contained in Business and Professions Code sections 6067 and 6068.  (Compl. ¶ 22.)  Similarly, plaintiff pleads that she "cooperated fully" with the BSA audit and that defendants were aware of her cooperation. (Compl. ¶¶ 23–24.)  This cooperation is mandated by California law.  *See, e.g.*, CAL. GOV'T CODE § 8545.2(a) ("Any officer or employee of any agency or entity having these records or property in his or her possession, under his or her control, or otherwise having access to them, shall permit access to, and examination and reproduction thereof, upon the request of the California State Auditor or his or her authorized representative.").  If any part of plaintiff's cooperation was not mandatory, but merely permissive, the two-prong *General Dynamics* test for retaliatory action based upon permissive conduct is still satisfied.  CAL. GOV'T CODE § 8547.2(e) ("Protected disclosure specifically includes a good faith communication to the California State Auditor's Office alleging an improper governmental activity and any evidence delivered to the California State Auditor's Office in support of the allegation.").  The first prong is satisfied because, as discussed above, the California Supreme Court has held that whistleblower statutes satisfy this prong.  *See Green*, 19 Cal. 4th at 76–77.  The second prong is satisfied because California Government Code section 8545.2, as quoted above, permits disclosure of protected communications.  *General Dynamics*, 7 Cal. 4th at 1188.[5]

---

[5] The *General Dynamics* court's rationale for permitting in-house attorney-employees to bring retaliatory discharge claims against their private employers, notwithstanding the lawyer-client privilege, applies with even greater force when the employer is a public agency with an explicit duty to the public.  *See* 7 Cal. 4th at 1180 ("[T]he theoretical reason for labeling the discharge wrongful in such cases is not based on the terms and conditions of the contract, but rather arises out of a duty implied in law on the part of the employer to conduct its affairs in compliance with public policy." (quoting *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 667 (1988) (internal citations omitted)).  Moreover, government lawyers are widely recognized to have "responsibilities and obligations different from those facing members of the private bar." *In re Witness before Special Grand Jury*, 288 F.3d 289, 293 (7th Cir. 2002); *see also In re Lindsey*, 158 F.3d 1263, 1273 (D.C. Cir. 1998) ("Unlike a private practitioner, the loyalties of a

1    Defendants' reliance on *Solin v. O'Melveny & Myers, LLP*, 89 Cal. App. 4th 451

2    (2001) is misplaced, because that case is distinguishable.  There, the court faced a narrow set of

3    facts involving a private attorney's representation of a private third party who was not even

4    involved in the dispute before the court.  *Id.* at 466.  The present case presents a larger, more

5    complex factual universe involving a public entity, who is the holder of the confidentiality

6    privilege and a party in the case.  The court heeds *General Dynamics*' rule that dismissal "will

7    seldom if ever be appropriate at the demurrer stage of litigation."  7 Cal. 4th at 1190.

8    The court declines defendants' invitation to accept as persuasive authority the

9    California Attorney General's published opinion ("AG Opinion"), which concludes that

10   attorneys cannot maintain CWPA suits.  *Freedom Newspapers, Inc. v. Orange Cnty. Employees*

11   *Ret. Sys.*, 6 Cal. 4th 821, 829 (1993) (the Attorney General's views are not binding although

12   they are entitled to "considerable weight").  The AG Opinion reasoned that attorneys cannot

13   sue under the CWPA because the CWPA's text, and the text of other similar statutes, indicates

14   the statutes were not intended to supersede the lawyer-client privilege.  84 Cal. Op. Att'y Gen.

15   71, at *5.  However, this reasoning is faulty in several critical respects: first, as explained

16   below, the CWPA's text does not say what the AG Opinion says it does; and second, the

17   interpretation that follows from this textual misrepresentation contravenes California Supreme

18   Court precedent.

19   First, the AG Opinion misrepresents the content of an important CWPA

20   provision.  To support its contention that the CWPA was not intended to supersede the attorney

21   client privilege, the AG Opinion states that the CWPA "provides that its prohibition shall not

---

22   government lawyer therefore cannot and must not lie solely with his or her client agency.").
23   While this theoretical tension does not support plaintiff's broad theory that her client, for the
     purposes of the confidentiality privilege, is the people of California, the unique role of
24   governmental lawyers requires a nuanced interpretation of California's Rules of Professional
     Conduct.  *See* Cal. R. Prof. Conduct 3-600 ("In representing an organization, a member shall
25   conform his or her representation to the concept that the client is the organization itself, acting
26   through its highest authorized officer, employee, body, or constituent overseeing the particular
     engagement."); *c.f.* Restatement (Third) of Law Governing Lawyers § 97 (2000) ("No
27   universal definition of the client of a governmental lawyer is possible.").

28

be deemed to diminish any right, privilege, or remedy under state or federal law of an individual in the exercise of official authority."  84 Cal. Op. Att'y Gen. 71, at *5 (citing Cal. Gov't Code § 8547.8(f)).  But the cited subdivision of the Government Code does not, and never did, refer to an "individual in the exercise of official authority."[6]  Instead, the provision reads: "Nothing in this article shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or state law or under any employment contract or collective bargaining agreement."  CAL. GOV'T CODE § 8547.8(f).

Second, whether the CWPA was intended to supersede the attorney-client privilege is not relevant when the attorney is alleging her employer terminated her for refusing to violate a mandatory ethical obligation prescribed by professional rule or statute.  *See General Dynamics*, 7 Cal. 4th at 1188 (attorneys may sue when they allege they were terminated for refusing to violate a mandatory ethical duty).  Furthermore, in the event an attorney was fired for engaging in conduct that was merely ethically permissible, the proper inquiry is not whether only the CWPA permits the attorney to depart from the usual requirement of confidentiality, but whether any statute or ethical rule permits this departure.  *See id.* at 1189 (attorneys must show "some statute or ethical rule specifically permits the attorney to depart from the usual requirement of confidentiality . . . .").

Defendants' argument that the CWPA explicitly disallows disclosures in circumstances such as those in this case is incorrect.  Some provisions of the CWPA do prohibit the disclosure of information protected by law.  For instance, sections 8547.3, 8547.11, and 8547.13 each contain the following stricture: "Nothing in this section shall be construed to authorize an individual to disclose any information, the disclosure of which is otherwise prohibited by law." CAL. GOV'T CODE §§ 8547.3(d), 8547.11(d), 8547.13(k).  However, by its own language this limitation applies only to each of those sections, not to the CWPA as a

---

[6] Section 8547.8 was amended in 2001, the same year the AG Opinion was published, but subdivision (f) was not modified.  S.B. 413, 2001 Cal. Legis. Serv. Ch. 883, Reg. Sess. (Cal. 2001).

1    whole, as defendants incorrectly contend.  (ECF 6-1 at 7 n.1.)[7]  And none of those three

2    sections is relevant to the case at bar.  Section 8547.3 applies to employees who retaliate

3    against another employee; plaintiff brings her CWPA claim against defendant CTC only.

4    Sections 8547.11 and 8547.13 apply to employees of the University of California and of

5    California courts, respectively.  Instead, plaintiff's claim ostensibly proceeds under section

6    8547.8, which prohibits any "person," defined to include state agencies (§ 8547.2(d)), from

7    engaging in acts of reprisal.  CAL. GOV'T CODE § 8547.8(c).  Moreover, California law contains

8    provisions that supersede the attorney-client privilege when the BSA (also known as the

9    California State Auditor) is authorized to conduct an audit under the CWPA.  *See, e.g.*, CAL.

10   GOV'T CODE § 8545.2(b) (California State Auditor has access to all records and property

11   notwithstanding any privilege provision, unless that privilege provision explicitly refers to

12   Government Code section 85454.2 and precludes access).

13                  Accordingly, plaintiff's CWPA claim may proceed.

14          B.      Labor Code Section 1102.5

15                  Defendants argue plaintiff is required to exhaust administrative remedies with

16   the Labor Department before bringing an action under Labor Code section 1102.5.  (ECF 6-1 at

17   5 (citing *Campbell v. Regents of the Univ. of Cal.*, 35 Cal. 4th 311, 317 (2005); Cal. Labor

18   Code § 98.7).)  A vast majority of federal courts in California require exhaustion of Labor

19   Department remedies, defendants contend.  (*Id.* (citing *Hanford Executive Mgmt. Employee*

20   *Ass'n v. City of Hanford* ("*Hanford*"), No. 1:11-CV-00828-AWI, 2012 WL 603222, at *17

21

22          ───────────────────
            [7] Defendants' parenthetical to their citation of Government Code section 8547.3(d)
23   reads: "stating that '[n]othing in [the California Whistleblower Protection Act (GOV'T CODE,
     § 8547 *et seq.*) [sic] shall be construed to authorize an individual to disclose information
24   otherwise prohibited by or under law'")  (ECF 6-1 at 7 n.1.)  The bracketed language,
     containing only an opening bracket in the brief as reproduced here, communicates that the
25   omitted word "section" is coterminous with the entire CWPA, which is termed "article" in the
     statutory scheme.  CAL. GOV'T CODE § 8547 ("This article shall be known and may be cited as
26   the "California Whistleblower Protection Act.").  This is a significant misrepresentation,
     prompting the court to remind counsel of their obligations under Federal Rule of Civil
27   Procedure 11(b)(2).

28

1   (E.D. Cal. Feb. 23, 2012)).)  Plaintiff counters that not every federal court requires exhaustion,

2   and those that do incorrectly interpret the California Supreme Court's *Campbell* decision to

3   specifically require exhaustion.  (ECF 7 at 5–7 (citing *Turner v. City and County of*

4   *San Francisco*, 892 F. Supp. 2d 1188, 1204 (N.D. Cal. 2012)).)

5           The court finds that exhaustion of Labor Department remedies is not required

6   here because plaintiff has sufficiently exhausted other administrative remedies.  This court

7   acknowledges the debate among California federal courts on this issue, but declines to take

8   sides.  *See Turner*, 892 F. Supp. 2d at 1200–01 (surveying California federal courts' differing

9   exhaustion requirements for actions under section 1102.5).  The California Supreme Court in

10  *Campbell* did not hold that plaintiffs must exhaust Labor Department remedies specifically;

11  instead, the court held that the plaintiff in *Campbell* should have exhausted her internal

12  university remedies.  35 Cal. 4th at 324.  The instant case is distinguishable from cases like

13  *Campbell* and *Hanford*, in which the courts dismissed section 1102.5 claims for failure to

14  exhaust, because the plaintiffs in those cases had not pursued any administrative remedies.

15  *Campbell*, 35 Cal. 4th at 317; *Hanford*, 2012 WL 603222, at *17.  Instead, this case is more

16  like *Turner*, 892 F. Supp. 2d at 1188.  In *Turner*, the court found the plaintiff satisfied the

17  exhaustion requirement by filing a charge with the Department of Fair Housing and

18  Employment, *id.* at 1200; similarly, plaintiff here alleges she has pursued three administrative

19  actions to their end, including a whistleblower action brought before the State Personnel Board.

20  (Compl. ¶ 28.)

21          Because plaintiff's administrative actions are sufficient to satisfy *Campbell*'s

22  exhaustion requirement, plaintiff's section 1102.5 claim may proceed.

23  /////

24  /////

25  /////

26  /////

27  /////

28  /////

C.     First Amendment Retaliation

The Ninth Circuit has distilled the evolution and "tangled history" of *Pickering v. Board of Education*, 391 U.S. 563 (1968), and the speech protections afforded public employees into a "sequential five-step series of questions":

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  Because plaintiff's failure to satisfy a step "necessarily concludes [the] inquiry," *Huppert v. City of Pittsburgh*, 574 F.3d 696, 703 (9th Cir. 2009), the court addresses only whether (1) plaintiff spoke on a matter of public concern (2) as a private citizen or as a public employee.  The court ultimately concludes below that, even though plaintiff spoke on a matter of public concern on some but not all of her claims, plaintiff has not sufficiently alleged that she spoke as a private citizen rather than in her capacity as a public employee.

1.     Public Concern

Defendants contend plaintiff's complaints about cronyism, nepotism, favoritism and personnel disputes at the CTC are not matters of public concern.  (ECF 6-1 at 11.) Defendants argue these complaints are similar to those in *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009).  Defendants argue that case, in which the policeman plaintiffs claimed their speech pertained to unit morale, operational efficiency and effectiveness, and potential government official misconduct, is factually similar to this case. (ECF 6-1 at 11.)  The *Desrochers* court held the plaintiffs' speech really concerned poor interpersonal relationships between coworkers and was therefore not a matter of public concern.  (*Id.*)  In the instant case, defendants concede the balance of plaintiff's complaints, including her statements about the alleged backlog of discipline cases, address matters of public concern, but insist some of her claims are really internal employment grievances.  (*Id.*)

Plaintiff responds that her complaints regarding illegal conduct by the CTC and its employees are not "personnel disputes," and that those complaints, as well as her allegations of cronyism, nepotism and favoritism, address matters of public concern.  (ECF 7 at 13 (citing *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 424–25 (9th Cir. 1995)).)  Moreover, *Desrochers* is distinguishable because the plaintiffs there made passing references to government functioning or safety, which were only incidental to the message the speech conveyed.  (*Id.* at 12.)  Here, plaintiff's complaints concerning cronyism, nepotism and favoritism are also matters of public concern, plaintiff asserts, because the BSA deemed them worthy of an investigation and ultimately confirmed plaintiff's reports.  (*Id.* at 13.)

"Speech involves a matter of public concern when it fairly can be said to relate to any matter of political, social, or other concern to the community." *Huppert*, 574 F.3d at 703 (alteration and internal quotation marks omitted).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983).  "[C]ontent is the greatest single factor in the *Connick* inquiry." *Havekost v. U.S. Dept. of Navy*, 925 F.2d 316, 318 (9th Cir. 1991). "Although necessarily driven by facts of a particular case, this determination is one of law for the court." *Roe v. City & Cnty. of San Francisco*, 109 F.3d 578, 584 (9th Cir. 1997).  "[T]he plaintiff bears the burden of showing that the speech addressed a [matter] of public concern." *Eng*, 552 F.3d at 1070.

The court holds that the content of plaintiff's speech relates to matters of public concern with one exception.  Here, plaintiff's "personnel complaints" concerning allegedly illegal CTC conduct, such as deciding case outcomes without Committee or CTC review and altering documents, are a matter of public concern.  (*See, e.g.*, Compl. ¶¶ 23(f), (h).)  These allegations demonstrate how the defendants' actions affected the CTC's proper functioning, "subjects that could reasonably be expected to be of interest to persons seeking to develop informed opinions about the manner in which an elected official[,] charged with managing a vital governmental agency, discharges h[er] responsibilities." *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004) (internal alteration omitted) (per curiam).

16

*Desrochers* is largely distinguishable from the instant case. There, the plaintiffs argued their supervisor's actions were of public concern because they affected the efficient functioning of the police department. 572 F.3d at 712. However, the court held the plaintiffs did not demonstrate how their supervisor's alleged actions, which amounted in the court's estimation to a "laundry list of reasons" why working for the defendant was an unpleasant experience, actually affected the department's functioning: for example, by providing accounts of failed investigations or law enforcement efforts. *Id.* at 712–13.

However, plaintiff's assertions that cronyism, nepotism, favoritism and fear of retaliation existed and "negatively impacted the working environment within the discipline division of the CTC" do not satisfy *Eng*'s first step. (Compl. ¶ 17.) Without more, these allegations describe the unpleasantness of the work environment but do not demonstrate how the CTC's functioning was affected. *Desrochers*, 572 F.3d at 712.[8] This portion of defendants' motion to dismiss is granted; however, all other allegations satisfy *Eng*'s first step.

### 2. Speech as Private Citizen or Public Employee

Defendants contend that plaintiff's complaints are not protected speech because they were made within the scope of her official duties as legal counsel for the CTC. (ECF 6-1 at 11-13.) Defendants' argument proceeds as follows. Plaintiff's speech to others within the CTC about its internal operations was made according to her official duties. (*Id.* at 11.) Her speech to the BSA and Senator Steinberg's office also must have occurred according to her official duties, else plaintiff ran afoul of her duty of confidentiality to her client. (*Id.*) In other words, plaintiff legally could have spoken with the BSA and Senator Steinberg only if CTC had waived its confidentiality privilege by giving her its consent to disclose confidential information. (*Id.*) Either way, plaintiff did not speak as a private citizen as a matter of law.

---

[8] The complaint references these allegations in two other places but never establishes a link to matters of public concern. Plaintiff only pleads the BSA conducted an audit based upon these assertions (Compl. ¶ 20), and that the BSA confirmed her reports of nepotism and favoritism (*id.* ¶ 26).

(*Id.* at 11-12 (citing *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1081–82 (1991); *Huppert*, 574 F.3d at 696).)

Plaintiff argues her speech was made in her capacity as a private citizen and that whether she spoke according to her actual official duties, as opposed to those nominally contained in her duty statement, is a question of fact.  (*Id.* at 13–14.)  Plaintiff asserts this case is similar to *Eng*, 552 F.3d at 1071, and is distinguishable from *Huppert*, 574 F.3d at 705–08, because in the latter the plaintiff police officers were speaking about activities their employer ordered them to carry out, while in the former the plaintiff district attorney spoke out against his supervisor's IRS report stating it was wrong and needed to be corrected.  (*Id.* at 14.)  Plaintiff further argues that her speech as expressed to the BSA and to Senator Steinberg did not violate her duty of confidentiality and did not require she obtain a waiver from the CTC because the BSA can compel information from state agencies and because plaintiff followed procedures provided by the California Whistleblower Protection Act.  (*Id.* at 15.)

Defendants counter that plaintiff has not sufficiently pled she acted as a private citizen.  (ECF 8 at 5–7.)  To survive a motion to dismiss, defendants contend, plaintiff must allege facts that establish her official duties and that demonstrate she made the purported speech in her capacity as a private citizen rather than a public employee, as prescribed in *Ceballos v. Garcetti*, 547 U.S. 410, 421 (2006).  (*Id.* at 5–6 (citing *Scott-Codiga v. Cnty. of Monterey*, No. 10-CV-05450–LHK, 2011 WL 4434812, at *6 (N.D. Cal. Sept. 23, 2011)).)  Further, defendants argue plaintiff may not use confidential information acquired during her employment with the CTC to pursue a First Amendment claim.  (ECF 8 at 6 (citing *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 825 (2011)).)

Plaintiffs state a claim for First Amendment retaliation only when they demonstrate they spoke in their capacity as private citizens.  *Garcetti*, 547 U.S. at 418–20.  In contrast, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.  "*Garcetti* and the Ninth Circuit cases interpreting it have looked to whether the employee had a duty to make

18

the speech in question." *Webb v. County of Trinity*, 734 F. Supp. 2d 1018, 1029 (E.D. Cal. 2010); *see also Posey v. Lake Pend Oreille School Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008) (a party is speaking as a citizen where there is no duty to make the speech at issue or the speech is not the result of some tasks the employee is paid to perform).  "A public employee's speech is not protected by the First Amendment when it is part of the employee's official job duties."  *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1105 (9th Cir. 2011). The plaintiff bears the burden of showing the speech was spoken in the capacity of a private citizen not a public employee.  *Garcetti*, 574 U.S. at 421–22.

Whether a person speaks as a public employee or a private citizen presents a mixed question of fact and law; however, where application of the law depends on a factual determination of the employee's job duties, such determination should be left to the fact-finder. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011).  Therefore, as a mixed question of fact and law, the *Garcetti* analysis presents a two-step inquiry: first, the factual inquiry into the scope of the plaintiff's job duties; and second, the constitutional inquiry into whether speech within the scope of the plaintiff's job duties is protected.  *Id.* (the "ultimate constitutional significance" is determined as a matter of law).

In performing the first step, as a "practical inquiry," the factual examination into the scope of job responsibilities is not rigidly governed by duties listed in a job description. *Garcetti*, 547 U.S. at 424–25.  "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."  *Id.*  The factual inquiry is antecedent to the determination of constitutional significance.  *Poway*, 658 F.3d at 966.

The controlling question before this court on this issue is whether plaintiff's complaints were made pursuant to her official duties as a staff attorney for the CTC.  In *Garcetti*, the Court considered whether a deputy district attorney's memo to his superior regarding the sufficiency of an affidavit underlying a warrant was protected speech.  547 U.S.

19

at 413–15.  Ultimately, the Court found the memo was not protected.  *Id.* at 421–22.  The facts that the plaintiff expressed his views internally, not publicly, and that his speech concerned his employment were not dispositive; however, the fact plaintiff's expressions were made pursuant to his duties as a calendar deputy, which included a responsibility to advise his supervisor about how best to proceed with a pending case, controlled.  *Id.* at 420–21.  Because there was no factual dispute that the plaintiff wrote the memo pursuant to his official duties, however, the Court did not "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate."  *Id.* at 424.

   In *Huppert*, *supra*, the Ninth Circuit addressed the official-scope-of-duty inquiry left open in *Garcetti*.  574 F.3d 696.  There, the Ninth Circuit considered, among other things, whether two police officers' cooperation with corruption investigations into their department, conducted internally by their department and externally by the local district attorney's office and the FBI, was protected under the First Amendment.  *Id.* at 698–700.  In holding their cooperation was not protected, the court considered several factors.  First, the plaintiffs were asked by their superiors to participate in the internal and district attorney investigations.  *See, e.g.*, *id.* at 705–06 (noting plaintiff Huppert was asked to participate in the district attorney investigation).  Second, the plaintiffs' investigation reports were reported only inside the relevant departments.  *Id.* at 704–06 (plaintiffs' reports were sent to their supervisor and to the City Manager only (citing *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2009))).

   Third, the court noted a consideration can be whether an individual complains "'up the chain of command'" or instead "'relays his concerns to persons outside the work place.'"  *Id.* at 705 (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008)).  Fourth, and most controversially, the court deferred to California case law to define the scope of a police officer's duties in California.  *Id.* at 707.  Because those duties include "investigating corruption so as to prevent the commission of crime and assist in its detection," Huppert's assertion that he was repeatedly informed by the FBI that his investigatory work was outside his duties as a police officer was insufficient.  *Id.* (quoting *Christal v. Police Comm'n of City and Cnty. of San Francisco*, 33 Cal. App. 2d 564, 567–68 (1939)) (internal quotations omitted).

1   The court held plaintiff's cooperation with the FBI was not protected speech even though

2   Huppert was not ordered to participate in the FBI investigation, which was external, and met

3   with the FBI "on his personal time." *Huppert*, 574 F.3d at 706–07.[9]

4          This court finds plaintiff has not met her burden in establishing she spoke as a

5   private citizen. *Garcetti*, 574 U.S. at 421–22.  As discussed above, to state a claim under the

6   CWPA as an in-house attorney, plaintiff must demonstrate that her alleged protected actions

7   were taken according to a mandatory or permissive law or ethical duty.  If plaintiff had a

8   mandatory duty as an attorney or, more specifically, as an in-house attorney for the CTC, to

9   perform any of the actions for which she allegedly suffered adverse consequences, then those

10  actions cannot as a matter of law serve as the basis for a First Amendment retaliation claim.

11  *Garcetti*, 547 U.S. at 424–25.  Plaintiff has alleged five instances in which she engaged in

12  protected speech for which she suffered adverse consequences.  The court has already found

13  that plaintiff had a mandatory duty not to take actions she pled would have violated Business

14  and Professions Code sections 6067 and 6068.  (Compl. ¶ 22.)  Based on the present complaint,

15  the court cannot discern whether plaintiff's other four instances of protected conduct were

16  mandated by law or ethical rule; therefore, plaintiff has not met her burden.

17         Even if in each instance the protected conduct was not mandatory, but

18  permissive, plaintiff does not plead the content of her job duties as a staff attorney such that the

19  court can discern the factual details necessary to make the "practical" inquiry *Garcetti* requires.

20

21         [9] The *Huppert* decision is instructive as it illustrates what a court in this Circuit should

22  consider when applying the *Eng* factors.  The court notes that a subsequent Ninth Circuit panel,

23  in *Dahlia v. Rodriguez*, 689 F.3d 1094 (9th Cir. 2012), has expressed reservations about
    *Huppert* while recognizing its precedential weight.  The court in *Dahlia* discussed at length the

24  errors the *Huppert* court committed in determining the scope of a California police officer's
    duties.  "The *Huppert* majority did exactly what the Supreme Court prohibited in *Garcetti*.  It

25  relied on a generic laundry list of police officer duties in an out-of-context California appellate
    court decision to determine, as a matter of law, that Huppert's speech fell within his job

26  duties."  689 F.3d at 1104.  Nonetheless, the "upshot" of *Huppert* is a rule that is not applicable

27  in the instant case: that the act of whistleblowing is itself a professional duty of police officers.
    *Dahlia*, 689 F.3d at 1106.

28

*Poway*, 658 F.3d at 966.  For this reason, this case is different from *Eng*, in which the plaintiff assistant district attorney pled facts that plausibly indicated he had no official duty to complain to a work committee on which he sat about the task force leader's leaking information to the IRS.  *See* 552 F.3d at 1073 (issue of material fact as to whether plaintiff's speech was part of his official duties).  Further, in the first, second, and third incidents of protected activity here, plaintiff merely reported up the internal chain of command, her speech was not directed outside her department, and she apparently spoke on the clock while at work, considerations that suggest she spoke as a public employee.  *Huppert*, 574 F.3d at 704–06.

At the same time, the court rejects defendants' argument that plaintiff's First Amendment claim is categorically barred because of her confidentiality obligations. Defendants contend this claim is barred because of the same confidentiality considerations at issue in her state-law whistleblower claim.  (ECF 8 at 5.)  But, as already discussed, plaintiff's claim is not categorically barred at this stage of the litigation.  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989 (9th Cir. 2009).

Because plaintiff has not met her burden to state a First Amendment retaliation claim, the court grants defendants' motion to dismiss this cause of action without prejudice.

IV.     CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is GRANTED in part and DENIED in part.  Plaintiff should file her amended complaint within twenty-one days of this order.

IT IS SO ORDERED.

DATED:  August 16, 2013.

_____
UNITED STATES DISTRICT JUDGE